UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

DOV FERSHTADT,

          Plaintiff,

- against -

VERIZON COMMUNICATIONS INC., THE
PLAN FOR GROUP INSURANCE,
METROPOLITAN LIFE INSURANCE
COMPANY, and UNUM LIFE INSURANCE
COMPANY OF AMERICA,

          Defendants.

------------------------------------------------------x

```
┌─────────────────────────────┐
│ USDS SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____             │
│ DATE FILED: _2|9|10_        │
└─────────────────────────────┘
```

07 Civ. 6963 (CM)

DECISION AND ORDER GRANTING THE MOTION FOR SUMMARY JUDGMENT
OF METROPOLITAN LIFE INSURANCE COMPANY, GRANTING IN PART AND
DENYING IN PART THE MOTION FOR SUMMARY JUDGMENT OF VERIZON
AND THE PLAN FOR GROUP INSURANCE, DEFERRING RESOLUTION OF THE
MOTION FOR SUMMARY JUDGMENT OF UNUM LIFE INSURANCE COMPANY
OF AMERICA, AND DENYING THE PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT

## INTRODUCTION

Plaintiff, Dov Fershtadt, commenced this action on August 2, 2007. His

complaint raised various claims under New York law and the Employee Retirement

Income and Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, related to a denial

of his claim for long-term disability benefits under an employee welfare benefit plan.

On April 24, 2008, this Court dismissed all but one of plaintiff's claims—a claim

for benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Thereafter, the

parties cross-moved for summary judgment.

Plaintiff argues that he is entitled to summary judgment reversing the denial of his claim.

Defendants Metropolitan Life Insurance Company ("MetLife") and Verizon Communications, Inc. ("Verizon") argue that they are entitled to summary judgment because they are not proper defendants in the appeal since they are neither plan administrators nor plan trustees. Defendant Unum Life Insurance Company ("Unum") has joined in these motions, which the Court understands as a motion by Unum for summary judgment dismissing it for the same reasons put forward by MetLife and Verizon.

In the alternative, Verizon and The Plan for Group Insurance ("PGI"), joined by Unum, argue that they are entitled to summary judgment affirming the denial of benefits.

Finally, Verizon, PGI and plaintiff have all moved to strike certain documents on the ground that they fall outside the scope of the administrative record.

For the reasons set forth below, the motion for summary judgment filed by MetLife (docket no. 51) is granted; the motions for summary judgment filed by Verizon and PGI (docket no. 57) are granted in part and denied in part; the motion for summary judgment filed by Mr. Fershtadt (docket no. 60) is denied; all motions to strike (docket nos. 84 & 90) are denied. Unum's motion for summary judgment (docket no. 64) will be decided following additional submissions.

## FACTS

Plaintiff Dov Fershtadt worked as an "outside plant engineer" at Verizon. (Pl.'s Rule 56.1 Statement ("Pl.'s 56.1 Stmt.") ¶ 3.) His employment with Bell Atlantic, a predecessor company, began in 1982. (Compl. ¶ 15; Verizon & PGI Rule 56.1 Statement

2

("Verizon 56.1 Stmt.") ¶ 1; see also Pl.'s 56.1 Statement ¶ 3.) His office was located in Tower 2 of the World Trade Center, which was destroyed on September 11, 2001. (Pl.'s 56.1 Stmt. ¶¶ 4-5.)

Despite the attack, Mr. Fershtadt was instructed to return to work the next day, and he reported to work at a new location, the JP Morgan Chase building on September 12, 2001. (Id. ¶ 6.) Thereafter, plaintiff "reached a point where he could no longer continue to work and felt that he had no choice but to take disability leave for a couple of months," which he did. (Id. ¶ 7.) He returned to work, but continued to suffer from "recurring fear, flashbacks, and the trauma of not knowing whether he would survive to see his wife and children again." (Id. ¶ 8.) Mr. Fershtadt was eventually diagnosed with "Post Traumatic Stress Disorder ('PTSD'), Depression, Organic Brain Syndrome, and Dementia." (Id. ¶ 11.)

Verizon provides both short- and long-term disability benefits for employees who cannot work due to medical conditions. While employed at Bell Atlantic, Mr. Fershtadt participated in something called the Bell Atlantic Disability Plan (the "Bell Atlantic Plan"). (Id. ¶ 20.) The terms of the plan entitled certain employees who became disabled, like Mr. Fershtadt, to long-term disability benefits in the amount of 50% of their pre-disability income, subject to an annual maximum of $420,000. (Id. ¶ 21; Verizon & PGI Rule 56.1 Counterstatement ("Verizon Cntrstmt.") ¶ 21.) Employees who participated in the plan at the 50% level were not required to make contributions, which meant that any benefits they received were taxable under the Internal Revenue Code. (Verizon 56.1 Stmt. ¶ 6; Bell Atlantic Disability Plan § 4.2.4 (VER0831).) The Bell Atlantic Plan also had two other benefits levels, a 60% and 70% level; however, those

levels required the payment of premiums, and plaintiff paid no premiums into the Bell

Atlantic Plan. (Verizon 56.1 Stmt. ¶ 4.)

In 2000, Verizon was created by the merger of Bell Atlantic Corp. and GTE Corp.

Each of the corporations that came together to make Verizon had its own disability plan,

with its own benefits.

Verizon contents that the Bell Atlantic Plan (also known as the "Legacy LTD

Plan") in which plaintiff participated was consolidated into something called the Verizon

Plan for Group Insurance as of January 1, 2002. (Verizon 56.1 Stmt. ¶ 8.) However, the

Plan for Group Insurance documentation provides only that certain Bell Atlantic plans,

including those numbered "515, 545, 547, 548, 554, 568 and 577" were to "merge . . .

with and into the Plan for Group Insurance, with the Plan for Group Insurance being the

surviving plan." (The Plan for Group Insurance, as amended and restated effective Jan.

1, 2002, at 1 (VER1100).) The copy of the Bell Atlantic Plan that Verizon has provided

to the Court contains no identifying plan number.

Beginning in October 2001, Bell Atlantic employees were given two options: they

could retain the disability insurance coverage they enjoyed under the Bell Atlantic Plan

(by taking no action), or they could elect to participate the "Verizon LTD Plan" (the

"Verizon Plan"). Like the Bell Atlantic Plan, the Verizon Plan offered an option,

pursuant to which an employee could elect to receive 50% of his pre-disability income.

The Verizon Plan also offered employees an opportunity to elect to receive 66 2/3% of

his pre-disability income, regardless of which benefits level was elected, so any benefits

received under the terms of the Verizon Plan were non-taxable. (Verizon 56.1 Stmt. ¶¶

10, 20-21.) But unlike the Bell Atlantic Plan, the Verizon Plan required the payment of premiums.

Verizon employees were offered an opportunity to change their long-term disability benefits during any "benefits renewal period." (Eyes on VZ Benefits Information ("2004 SPD") at 8-17 (VER1049).) There was a benefits renewal period every year, and a Summary Plan Document ("SPD") explaining the plan(s) and the benefits available thereunder was prepared for distribution to employees. Plan administrators must furnish to participants a summary plan description pursuant to ERISA § 101(a), 29 U.S.C. § 1021(a). The SPD must "be written in a manner calculated to be understood by the average plan participant," and must "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." ERISA § 102(a), 29 U.S.C. § 1022(a). The SPD must describe, among other things, the plan's requirements governing eligibility for participation and benefits as well as the procedures for presenting claims for benefits. ERISA § 102(b), 29 U.S.C. § 1022(b).

Mr. Fershtadt began receiving short-term disability benefits in July 2004. His short-term disability benefits were paid in accordance with the terms outlined in the 2004 SPD. (Verizon 56.1 Stmt. ¶ 14.)

Plaintiff contends that he never "applied for benefits under any specific plan." (Pl.'s Rule 56.1 Counterstatement ("Pl.'s 56.1 Cntrstmt.") ¶ 14.) But plaintiff, like every other Verizon employee, had an annual opportunity to elect which plan to participate in, and there is no evidence that he elected participation in anything other than the (Bell Atlantic) Legacy Plan at the 50% benefits level for the year 2004.

Because Mr. Fershtadt was, by election, a participant in the Bell Atlantic (or Legacy) Plan at the 50% benefits level, had he begun receiving long-term disability benefits in July 2004, it is beyond cavil that those payments would have been in the amount of 50% of his pre-disability earnings, taxable, and subject to an annual maximum of $420,000.

However, Mr. Fershtadt did not begin receiving long-term disability benefits until July 2005.

On October 12, 2004—while he was receiving short-term disability benefits, plaintiff received an email from the Verizon's "HR Communications." It said the following:

> The former Bell Atlantic long-term disability (LTD) option in which you're currently enrolled is changing for 2005. As announced recently, Verizon is consolidating the LTD options to offer consistent coverage choices to all management employees. For 2005, you will have a choice of two employee-paid LTD options that replace either 50% or 66 2/3% of your annual benefits compensation. Or, you may choose no coverage. If you don't make a choice during benefits renewal, you'll be assigned the 50% option and payroll contributions will begin in January.

(Email from Verizon HR Communications to D. Fershtadt, October 12, 2004, at 1 (VER0070).) The 2004 SPD provides that an individual may "elect coverage under the Verizon LTD Plan . . . during any benefits renewal period." (2004 SPD at 8-17 (VER1049).) This provision does not specifically bar individuals who were already receiving short-term disability benefits from making a new election, so in October 2004, during the company's annual benefits renewal period, Mr. Fershtadt—who, one infers, anticipated a lengthy period of disability—submitted an election to be covered by the Verizon LTD Plan, which would provide him with long-term disability benefits of 66

6

2/3% of his pre-disability income. (Pl.'s 56.1 Stmt. ¶¶ 30-33; Verizon 56.1 Stmt. ¶ 20 (citations omitted).)

Verizon confirmed plaintiff's selection in writing on October 22, 2004. (See Benefits Confirmation, Oct. 22, 2004 (VER0075).) Plaintiff paid premiums to participate in the plan, and Verizon accepted and processed those payments. (Pl.'s 56.1 Stmt. ¶ 37.)

Furthermore, plaintiff had numerous conversations about his benefits with Verizon representatives, who uniformly represented to him that he qualified for long-term disability payments under the Verizon Plan beginning in January 2005. (Id. ¶¶ 42-49.) In August 2005, Mr. Fershtadt also received a document entitled "Confirmation of Coverage Status Change," which indicated that he would receive long-term disability benefits under the Verizon Plan at the level of 66 2/3% of his pre-disability income. (Verizon 56.1 Stmt. ¶ 22.)

Mr. Fershtadt's eligibility for short-term disability benefits expired after 52 weeks, on July 30, 2005. (Id. ¶ 15.) He then began receiving long-term disability benefits. The benefits were not paid at the rate of 66 2/3% of his pre-disability income. Specifically, from August 2005-June 2006, he received $6,529 per month; in July 2006, he received $9,382; in August 2006, he received $7,284, and that month, for the first time, his benefits were held to be taxable. (Pl.'s 56.1 Stmt. ¶ 16.)

In August 2006, Mr. Fershtadt's benefits were terminated pursuant to a provision in the 2004 SPD that that purportedly "limited benefits to 12 months for disabilities arising from mental or nervous illnesses or conditions ('M&N Limitations Provision')." (Pl.'s 56.1 Stmt. ¶ 54 (citing VER0069).) The Bell Atlantic Plan contained no such

7

limitation, but such limitation appears to have applied to members of the 2004 Verizon Long Term Disability Plan—which no one argues is applicable to Mr. Fershtadt's claim.

Therefore, Mr. Fershtadt appealed his denial of benefits (to third-party claims administrator MetLife), and by letter dated September 18, 2006, his benefits were reinstated. (Id. ¶ 58 (citing VER0052).)

However, in that letter, MetLife also communicated to him that Verizon had instructed MetLife to adjudicate his claims under the "Verizon Management 2004 plan effective 1/1/2004," or the 2004 SPD. (Letter from MetLife to D. Fershtadt, Sept. 18, 2006, at 1 (VER0052).) According to the terms of that plan, MetLife explained, Mr. Fershtadt's benefits were "calculated by taking 50% of your basic monthly salary of 20,058.23, or the maximum LTD benefit payment of $8,333.00 the lesser of the two, resulting in a maximum monthly benefit payment of $8,333.00." (Id.) Although the 2004 SPD provided that long-term disability benefits under the plan were nontaxable, the letter further explained, "because you paid your Long Term Disability premiums with post tax dollars, the benefits you receive *will* be taxable." (Id. (emphasis added).)

On November 16, 2006, plaintiff, through his attorney, first complained directly to Verizon about his benefits determination. On that day, he submitted a 22-page claim seeking benefits under the Verizon Plan that he believed he had elected in October 2004. (See Verizon 56.1 Stmt. ¶ 22 (acknowledging submission of claim).)

By letter dated January 4, 2007, the "Verizon Claims Review Unit" (the "VCRU") denied his claim. (Id. ¶ 23.) Plaintiff filed an appeal by letter dated April 27, 2007. (Id. ¶ 24.) He heard nothing for some months, and he filed this lawsuit on August 2, 2007. Five days later, on August 7, 2007, the Verizon Claims Review Committee (the

"VCRC") denied Mr. Fershtadt's appeal—and finally explained the reason why.

Specifically, the VCRC stated:

> On June 14, 2007, the Verizon Claims Review Committee . . . reviewed your request . . . to receive Long-Term Disability ('LTD') benefits under The Plan for Group Insurance (the 'Plan') under Option 3 - 66 2/3% of pay. . . .
>
> Based on all of the information available to the Committee and after a thorough review of the claim file, your request has been denied. Therefore, Mr. Fershtadt will continue to receive benefits in accordance with the provisions of the former Bell Atlantic Plan, which is Option 6 - 50% of pay. . . .
>
> In accordance with the terms of the Plan, because Mr. Fershtadt was approved for STD [short-term disability] benefits in July 2004, and he did not return to work at any time before he commenced his LTD benefits, his LTD benefits are based on the LTD option he was enrolled in when he was approved for STD benefits, which was Option 6, 50% of pay. . . .
>
> Although Mr. Fershtadt was allowed to enroll in the employee-paid 66 2/3% of pay LTD option during the benefit renewal period for the 2005 plan year, his LTD benefits must be paid in accordance with the option that he was enrolled in when his STD benefits were approved, which is the former Bell Atlantic Option 6 - 50% of pay.

(Letter from VCRC to M. Hiller, Aug. 7, 2007 (the "Final Denial Letter"), at 1-2 (VER002-003).)

The letter also explains that his eligibility must be determined according to the terms of

the 2004 SPD, which is the document that defendants argue limits long-term disability

benefits to the plan an employee was enrolled in on the date he began receiving short-

term disability benefits. (Id. at 2 (VER003).) The letter continues:

> In reviewing Mr. Ferstadt's appeal, we discovered that his LTD benefit is not being administered in accordance with the provisions of Option 6 - 50% of pay, as his payments are currently being subject to an $8,333 monthly cap. . . . Based on our findings, MetLife's records have been updated to reflect the adjusted monthly LTD payment of $10,029. . . .
>
> Additionally, the [Committee] was advised that LTD premiums in the amount of $30.77 were erroneously deducted from Mr. Fershtadt's pay for

16 pay periods.  Since the former Bell Atlantic LTD 50% pay option is non-contributory, enclosed with this letter is a check made payable to Mr. Fershtadt in the amount of $492.32 [the amount of the contributions]. . . .

The Committee is aware that Mr. Fershtadt received incorrect information from representatives of the Verizon Benefits Center and we apologize for any confusion it may have caused.

(Id. at 3 (VER004).)

The issue for decision is whether plaintiff is entitled to the higher benefits he elected to receive in October 2004 or was limited to the lesser benefits available under the Bell Atlantic Plan that covered him when he began collecting short-term disability benefits.

**The 2004 SPD**

The 2004 SPD contained the following language, which referred to eligibility under the Verizon Plan:

Your contributions for LTD coverage are based on your annual benefits compensation as of July 1 of the prior calendar year and the LTD option you chose.  Your benefits, however, are based on your annual benefits compensation . . . on the date you become totally disabled (that is, the first date of STD [short-term disability]) and the LTD option you chose during that benefit plan year.

(2004 SPD at 8-17 (VER1049).)

The 2004 SPD also provided that: "the maximum monthly LTD benefit the plan will pay, based on the options available to you, are [sic]:

- 50% of annual benefits compensation option: Maximum monthly benefit is $8,333

- 66-2/3% of annual benefits compensation option: Maximum monthly benefit is $11,111."

(2004 SPD at 8-19 (VER1051).)

10

These provisions make the amount of a plan participant's long-term disability benefit a function of: (1) the compensation he was receiving on the date he first began collecting short-term disability, and (2) the long-term disability benefit plan option chosen by the employee for "that benefit plan year." According to Verizon, the phrase "that benefit plan year" limits an employee's long-term disability to the long-term disability benefits he had elected when he began receiving short-term disability benefits.

## DISCUSSION

### I.    Legal Standard

Although this case involves the review of an administrative record, the familiar summary judgment standard applies. See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp., 440 F.3d 571, 575 (2d Cir. 2006). The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. ("FRCP") 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting FRCP 56(c)); accord Miner v. City of Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Where the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the nonmovant's claim. Celotex, 477 U.S. at 323-25; Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d

Cir. 1998). Once the movant has established a prima facie case demonstrating the lack of a genuine issue of material fact, the nonmoving party must provide enough evidence to support a jury verdict in its favor. Anderson, 477 U.S. at 248; Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). A plaintiff, as the nonmovant, may not rely on conclusory statements or mere contentions that the evidence in support of summary judgment is not credible. Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Similarly, a plaintiff may not rest "merely on allegations or denials" in its complaint to demonstrate the existence of a genuine issue of material fact. FRCP 56(e). Therefore, after discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex, 477 U.S. at 323. When addressing a motion for summary judgment, the Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant, 923 F.2d at 982.

### A.    Unpleaded Claims and Improper Parties

There are two threshold matters currently before the Court.

First, plaintiff currently has one claim pending against defendants: a claim for benefits under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132 (a)(1)(B). But in his motion for summary judgment, plaintiff seeks judgment on unpleaded claims, including a request for civil penalties pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c). Any claims not raised in his complaint, including the 502(c) claim, are not properly before this Court. No

12

motion for leave to amend the complaint has even been made, and the case is almost three years old—and at the stage when dispositive motions are pending. The Court declines to consider these new and unpleaded claims, and plaintiff's motion for summary judgment on them in his favor is denied. See, e.g., LaFramboise Well Drilling, Inc. v. R.J. Dooley & Assocs., Inc., No. 05 Civ. 0956, 2007 WL 430285, at *5 (S.D.N.Y. Feb. 7, 2007) (denying summary judgment on unpleaded claim).

Second, MetLife and Verizon argue they are entitled to summary judgment because neither is a "plan administrator" or "plan trustee," and "in a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." Leonelli v. Pennwalt Corp., 887 F.2d 1195, 1199 (2d Cir. 1989); see also Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 108 (2d Cir. 2008) (same). They argue that this is true even if they exercised some discretion and authority in rendering benefits determinations. See Krauss v. Oxford Health Plans, Inc., 418 F. Supp. 2d 416, 434 (S.D.N.Y.2005) ("An entity may 'administer' some elements of a covered Plan as a fiduciary without being the plan administrator.").

Unum has joined in this motion (docket no. 64), but PGI has not moved on this ground, because it is "the plan" and, therefore, is amenable to suit. (See The Plan for Group Insurance, Article 1 (VER1100); Verizon & PGI Mem. in Supp. of Mot. for Summ. J., Mar. 16, 2009, at 10 (acknowledging that PGI is a proper party to the suit).)

ERISA defines the term "administrator" to mean "the person specifically so designated by the terms of the instrument under which the plan is operated" or "if the administrator is not so designated, the plan sponsor." 29 U.S.C. § 1002(16)(A). Metlife and Verizon are correct.

13

The relevant plan documents make clear that MetLife was not the "plan administrator," and therefore, it is improperly named as a defendant in this action for benefits under ERISA § 502(a)(1)(B). (See 2004 SPD at 9-3 (VER1061); accord 2005 SPD 9-4.) Further, the plan documents indicate that MetLife neither insures nor funds the plan nor had any responsibility for making the eligibility decision regarding Mr. Fershtadt's long-term disability benefits. (See 2004 SPD at 9-6 (VER1064); accord 2005 SPD at 9-7; see also Letter from MetLife to D. Fershtadt, Sept. 18, 2006, at 1 (indicating that Verizon determined that the 2004 SPD applied to Mr. Fershtadt's disability claims) (VER0052).) Accordingly, it is not a proper party to this litigation.

Likewise, Verizon was the plan's sponsor and plaintiff's employer, but it is not the plan administrator. (See 2004 SPD at 9-3 (VER1061); accord 2005 SPD 9-3.) According to both the 2004 and 2005 SPDs, the "Chairperson of the Verizon Employee Benefits Committee" is the plan administrator. (2004 SPD at 9-3, 9-6 (VER1061, VER1064); 2005 SPD at 9-4, 9-7).) Further, the 2004 and 2005 SPDs state that the Verizon Employee Benefits Committee (the "VEBC") has delegated its authority to the Verizon Claims Review Committee (the "VCRC") to render eligibility decisions, suggesting that either or both may be amenable to suit. (2004 SPD at 9-20 (VER1078); 2005 SPD at 9-21.) Although both the VEBC and VCRC are staffed by employees of Verizon Communications, Inc., the corporate entity *itself* is not named as the plan administrator, and therefore is not a proper party in an action for recovery of benefits. This rule is applied strictly in this Circuit; even if Verizon had acted as a "de facto co-administrator," it would still not be amenable to suit on plaintiff's claims because it was

not listed as the plan administrator in the SPDs. See Crocco v. Xerox Corp., 137 F.3d 105, 107 (2d Cir. 1998).

Mr. Fershtadt attempts to argue around these facts, by alleging that a "plan fiduciary," like MetLife or Verizon, can be sued under ERISA to the extent it "exercises any discretionary authority or discretionary control respecting management of such plans or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). But while this may be true for certain causes of action arising under ERISA, the Second Circuit has made clear that in a denial of benefits appeal under ERISA § 502(a)(1)(B), plaintiff's sole remaining claim, "only the plan and the administrators and trustees of the plan in their capacity as such may be held liable." Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 108 (2d Cir. 2008); Crocco v. Xerox Corp., 137 F.3d 105, 107 n.2 (2d Cir. 1998). And that is the only claim pleaded. Because MetLife and Verizon are not plan administrators or plan trustees, they are entitled to summary judgment dismissing them as defendants in this suit.

For the same reasons that MetLife and Verizon are improper parties, it would appear that plaintiff's claims against Unum must be dismissed. Both the 2004 and 2005 SPDs lists "UnumProvident" as an "outside administrative organization," which "provides long-term disability benefits." But the documentation also identifies the Verizon Employee Benefits Committee as the plan administrator and indicates that the plans are "self-insured" by Verizon. (2004 SPD at 9-6 (VER1064); 2005 SPD at 9-7.) If Unum is not named as the plan administrator or a plan trustee and does not fund the plan, it is not a proper party to this action. However, Unum has done nothing except join in MetLife and Verizon's motions, without offering evidence in support of its own situation.

I will give Unum 10 days to submit evidence explaining what it does as an "outside administrative organization," to whom it answers and whether it provides insurance for the plans. Plaintiff will then have 10 days to show cause why summary judgment should not be granted in Unum's favor. There will be no extensions allowed.

The suit remains alive against PGI, as "the plan."

### B.    Motions to Strike

There are two motions to strike currently pending before this Court. PGI has filed a motion to strike a declaration signed by counsel for plaintiff (docket no. 67) on several grounds, including technical noncompliance with FRCP 56(e).[1]  Plaintiff's counsel has attempted to remedy the errors identified by PGI through his supplemental declaration (docket no. 99), and accordingly, PGI's motion to strike is denied.

Additionally, plaintiff has submitted a motion to strike certain documents from the record. Plaintiff seeks to exclude the 2005 SPD, because, inter alia, it has not been properly authenticated and because it is not included in the administrative record. He also seeks to exclude the Final Denial Letter, because it was sent five days after this suit was commenced; he argues that it cannot be properly considered a part of the administrative record.

Plaintiff's motion to strike is denied.

The 2005 SPD has been properly authenticated by Stephanie Zweban, Director of Benefits at Verizon Corporate Resources Group, who submitted a declaration stating her familiarity with the document and recognizing the document's authenticity.  Moreover,

---

[1] The Court recognizes that the motion papers were filed principally by Verizon and were joined by PGI and Unum. However, since this Court has dismissed the suit as against Verizon, the motions to strike and for summary judgment will be referred to as "PGI's motion to strike" and "PGI's motion for summary judgment," and the arguments propounded by Verizon will be attributed to PGI, which adopted them.

the 2005 SPD was referenced extensively in plaintiff's complaint (see Compl. ¶¶ 49-59), even though no copy was appended. This constitutes good cause sufficient to warrant consideration of the 2005 SPD by this Court. Cf. Krizek v. CIGNA Group Ins., 345 F.3d 91, 97 (2d Cir. 2003) (holding that a district court may expand its review of an administrative decision beyond the record in front of the claims administrator for "good cause").

Plaintiff does raise the question of whether there are multiple versions of the 2005 SPD. (Pl. Mot. to Strike ¶ 4.) He argues that he received three partial versions of the 2005 SPD at various points during the pendency of his benefits claim. (Id.) He further contends that each version had a cover page that was slightly different from the others. (Id.) Although he does not opine on the substantive differences between the various versions of the 2005 SPD that might exist, this Court will expect defendants to produce at trial any and all versions of the 2005 SPD that were distributed to Verizon employees, including complete versions of the three 2005 SPDs that were distributed under the covers produced by Mr. Fershtadt.

The Final Denial Letter is a part of the administrative record, which "consists of all evidence that was before the administrator as of the date of the *final* determination." Sarosy v. Metropolitan Life Ins. Co., No 94 Civ. 5431, 1996 WL 426387, at *8 (S.D.N.Y. July 30, 1996) (emphasis in original). As further explained below, the fact that the determination was issued after this lawsuit was commenced is relevant to the level of deference afforded the plan administrator, not to the scope of the administrative record— especially not where, as here, the letter issued only a few days after the lawsuit was filed

17

and therefore does not run the risk of unfairly surprising or causing prejudice to the plaintiff.

### C.     The Standard of Review for an Appeal of a Denial of Benefits

ERISA permits an employee denied benefits under an ERISA-governed plan to challenge that denial in federal district court. See 29 U.S.C. § 1132(a)(1)(B). Further, while "ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B)," under Supreme Court precedent, a district court must review a denial of plan benefits under a de novo standard of review unless the plan provides to the contrary. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109, 115 (1989). If a "plan provides to the contrary by granting the administrator or fiduciary discretionary authority to determine eligibility for benefits," the district court must apply an "arbitrary and capricious" standard of review. Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2348 (2008) (citation, internal quotation marks, and emphasis omitted). Under an arbitrary and capricious standard of review, a court can overturn an administrator's denial of benefits only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995).

Historically, there have been several important exceptions to the above presumption in favor of arbitrary and capricious review, including cases where the denial of benefits was not rendered within a certain number of days of the request for review. Specifically, federal regulations implementing ERISA require a plan administrator to decide a disability claim within a specified period of time. See, e.g., 29 C.F.R. § 2560.503-1(i)(3)(i) (providing plan administrator forty-five days from receipt of request

for plan review to notify employee of its claim determination); id. § 2560.503-1(i)(1)(i) (providing plan administrator with an additional forty-five days if it determines that "special circumstances" require such an extension). Until 2002, ERISA further provided, "If a decision on review is not furnished within [the specified period of time], the claim shall be deemed denied on review." 29 C.F.R. § 2560.503-1(h)(4). "Deemed denied" claims were automatically subject to de novo review. See Nichols v. The Prudential Ins. Co. of America, 406 F.3d 98, 109 (2d Cir. 2005).

Effective January 1, 2002, § 2560.503-1(h)(4) was superseded by language that currently provides that if a plan fails to follow the above timing requirements, "a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies [in federal district court] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. § 2560.503-1(l). Interpreting the post-2002 language, at least one court in this District (in an unpublished disposition) has limited the standard of review presumption established by Nichols—that a claim rendered untimely is subject to de novo review—"to those cases where the administrator fails to respond at all, not those cases where the response is tardy." See, e.g., Morgenthaler v. First Unum Life Ins. Co., No. 03 Civ. 5941, 2006 WL 2463656, at *3 (S.D.N.Y. Aug. 22, 2006). However, the Second Circuit has expressly reserved the question of whether the Nichols presumption of de novo review is still applicable under the post-2002 version of the regulation. See Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 624 (2d Cir. 2008). Moreover, in Nichols, the Circuit expressed serious doubts that de novo review

would ever be appropriate in a case where the decision was rendered *after* a plaintiff filed suit. 406 F.3d at 109.

Here, no one disputes that the administrator was vested with discretion. Plaintiff only asks this Court to apply review the decision de novo, because the administrator denied his eligibility 100 days after he filed his appeal (and five days after he filed this suit). However, in formulating his request, plaintiff relies upon a pre-2002 version of the law. After 2002, plaintiffs are not automatically entitled to de novo review simply because the denial of benefits was tardy. Rather, as the Second Circuit explained in Nichols, what matters is whether there has been "substantial compliance" with the deadlines, which would "forgive[ ] technical noncompliance for purposes of review of a plan administrator's discretionary decision." Nichols v. Prudential Ins. Co. of America, 406 F.3d 98 (2d Cir. 2005).

Whether it is possible for a defendant to have "substantially complied" with relevant deadlines when the denial issues after litigation has commenced is an issue that has not yet been decided by the Second Circuit. PGI points out that at least one other district court has found substantial compliance where a final denial was rendered after the plaintiff filed suit. See Kohut v. Hartford Life and Acc. Ins. Co., No. 08 Civ. 669, 2008 WL 5246163, at *6 (D. Colo. Dec. 16, 2008) (claim denied 74 days later and two days after plaintiff filed suit). But Kohut is factually inapposite. That case, and the precedent on which it relied, addressed situations where the denial of benefits was tardy, but the defendants had engaged in ongoing communications with the claimant during the period of the delay. See id., 2008 WL 5246163 at *6 (citing cases). No one contends that there was any such dialogue in this case.

20

Further, the Second Circuit has declined to apply the substantial compliance doctrine under facts analogous to those at bar. As Judge Pooler explained in Nichols, regardless of the merits of the substantial compliance doctrine—which the Second Circuit has never formally adopted—the doctrine was certainly inapplicable in that case, where, as here, the defendant had failed to acknowledge the appeal by the administrative deadline and failed to render a decision by time the suit was brought. Nichols, 406 F.3d at 109.

Applied to the facts at bar, Nichols compels the conclusion that the VCRC's final denial of benefits should be subjected to de novo review.

## II. De Novo Review of Plaintiff's Denial of Benefits

The Final Denial Letter sets forth the rate at which plaintiff is currently receiving long-term disability benefits: $10,029 per month, fully taxable, under the terms of the Bell Atlantic Plan. (Final Denial Letter at 3 (VER0004).) The letter explains that this determination was made based upon the plain text of the 2004 SPD, pursuant to which the plaintiff's long-term benefits were to be determined by the plan in which he was enrolled when he became disabled. (Id.) Specifically, the letter cites two relevant portions of the 2004 SPD. The first provision governs only the "coverage date," providing that "the LTD coverage date is determined by the date you first become disabled." The second says, "your benefits, however, are based on your annual benefits compensation on the date you become totally disabled (that is, the first date of STD) and the LTD option you chose *during that plan year*" (hereinafter the "LTD Coverage Date

Clause"). (Id. at 2 (VER0003) (quoting 2004 SPD at 8-16, 8-17 (VER1048-49) (emphasis added).)[2]

This language is, at best, ambiguous.

"The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court." Compagnie Financiere De Cic Et De l'UNION Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir. 2000). "The court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would strain the contract language beyond its reasonable and ordinary meaning." Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990) (quotation marks and citation omitted). However, "when the language of a contract is ambiguous and there is relevant extrinsic evidence regarding the actual intent of the parties, an issue of fact is presented for [the fact-finder] to resolve, thereby precluding summary judgment." Scholastic, Inc. v. Harris, 259 F.3d 73, 83 (2d Cir. 2001).

In this case, the 2004 SPD provides that an employee "may, however, elect coverage under the Verizon LTD Plan (i.e., 50% or 66 2/3%) during *any benefits renewal period*" (hereinafter the "Election Clause"). (2004 SPD at 8-17 (emphasis added).) The Election Clause provides a single limitation on an employee's right to choose (elect) a benefits plan—the election must take place during a benefits renewal period. The clause does not say that employees who are already receiving short-term disability benefits may *not* elect to change their benefits during a renewal period.

---

[2] The parties agree that the relevant language governing whether plaintiff could have validly elected a different long-term disability plan after he was already receiving short-term disability benefits is identical in all material ways in the 2004 and 2005 SPDs. Therefore, to the extent that there is a dispute regarding the applicable SPD, it is irrelevant to a determination of whether plaintiff was eligible to elect a new benefits level in October 2004, when he purported to do so.

PGI argues that the failure to read such a limitation into the Election Clause would violate the canons of contract interpretation because it would render certain other clauses meaningless. (Verizon & PGI Mem. in Opp. to Mot. for Summ. J., at 11 (S.D.N.Y. May 15, 2009).) For example, the same text box that contains the Election Clause also contains a paragraph that states in relevant part:

> Keep in mind that if you choose to continue your LTD benefits under one of those coverage options of the former Bell Atlantic LTD Plan *and you subsequently become totally disabled*, your employment with Verizon will be terminated at the end of the STD period. As a result, you are not eligible to accrue service for pension benefits while you are totally disabled.

(Id. (quoting 2004 SPD at 8-17).)

PGI opines that since the "date of total disability" is defined in the 2004 SPD as the first date on which a claimant receives short-term disability benefits (id. (citing 2004 SPD at 8-17)), the paragraph makes clear that "the text that precedes it is directed at participants in the Bell Atlantic Disability Plan who are *not already* 'totally disabled.'" (Id. (emphasis in original).) While PGI's arguments are not without some logic, I do not see how Mr. Fershtadt's reading eviscerates this or any other provision of the plan.

Rather, the readings advanced by both parties appear to be plausible, which suggests that the relevant contract language is ambiguous.

In this case, the Court finds that there is one critical and ambiguous phrase in the 2004 SPD—that word is "during" as used in the LTD Coverage Date Clause. The clause provides that "the LTD coverage date is determined by the date you first become disabled," and "your benefits . . . are based on your annual benefits compensation on . . . the first date of STD [ ] and the LTD option you chose *during* that plan year." (2004 SPD at 8-17 (VER1049).) It is undisputed that plaintiff "chose" (elected) to participate in

the 66 2/3% Verizon Plan "during" the year 2004—he made his election to switch plans during that year. Of course, that election did not go into effect until January 1, 2005, but 2005 is the first year in which plaintiff began collecting long-term disability benefits— not the year in which he "chose" to be covered by the 66 2/3% Verizon Plan. It is not unambiguously clear that plaintiff's long-term disability rate is determined as of the date he begins collection short-term disability benefits. Plaintiff literally chose the Verizon Plan as his long-term disability benefits plan *during* the plan year that encompassed the first date of his short-term disability benefits. Under the plain language of the 2004 SPD, plaintiff appears to have validly elected to participate in the Verizon Plan. The fact that Verizon both solicited a new election from plaintiff (who was already receiving short-term disability benefits) and then confirmed his enrollment in the Verizon Plan on several occasions, constitutes extrinsic evidence suggesting that the 2004 SPD is not without ambiguity.

PGI's interpretation of the LTD Coverage Date Clause is perfectly reasonable—it makes little sense to allow someone who is already disabled, someone who already anticipated collecting long-term disability benefits, to opt into a more generous plan at that point. And as PGI has explained, at least one clause in the SPD suggests that the option to elect a new long-term disability benefits plan was available only to individuals who were not already receiving short-term disability benefits.

But of course, it is all a function of the language, and the language is unclear. Accordingly, the question of the interpretation of "during" in the LTD Coverage Date Clause presents a triable issue of fact. Plaintiff's motion for summary judgment is denied. At trial, both sides can introduce evidence to support their respective

constructions of the plan language—which means that PGI can introduce evidence of how this clause has been interpreted in other situations.

## III.    No "Extraordinary Circumstances" Justify Estoppel

Plaintiff argues that PGI is estopped from contesting his right to receive benefits under the Verizon Plan, because he validly elected that plan, paid premiums thereunder and representatives of Verizon confirmed his coverage election numerous times. (Pl.'s Mem. in Supp. of Mot. for Summary Judgment, at 12-16 (S.D.N.Y. Mar. 16, 2009).) However, the case law makes clear that estoppel is unavailable on the facts at hand.

Promissory or equitable estoppel is available on ERISA claims only in "extraordinary circumstances." Devlin v. Transp. Commc'ns Int'l Union, 173 F.3d 94, 101 (2d Cir. 1999) (internal quotation marks omitted); see Bonovich v. Knights of Columbus, 146 F.3d 57, 62 (2d Cir. 1998); Shonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 78 (2d Cir. 1996); Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993). To prevail on an estoppel claim under ERISA, plaintiff must prove "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced," and must "adduce [ ] . . . facts sufficient to [satisfy an] 'extraordinary circumstances' requirement as well." Aramony v. United Way Replacement Benefit Plan, 191 F.3d 140, 151 (2d Cir. 1999) (internal quotation marks omitted) (alterations in original).

Here, it is not clear that plaintiff has suffered an injury in reliance upon Verizon's representations regarding his long-term disability benefits coverage, since it is undisputed that amounts he paid for enrollment in the Verizon Plan have been refunded. But even if

25

plaintiff was injured, this case simply does not present the kind of "extraordinary circumstances" sufficient to warrant application of estoppel.

The Second Circuit has limited application of the doctrine to circumstances where a defendant induced an irrevocable action on the part of a claimant. For example, in Shonholz v. Long Island Jewish Med. Ctr., the defendants promised severance benefits in order to induce the plaintiff to retire and then reneged once she resigned. See Devlin, 173 F.3d at 102 (discussing Shonholz). Applying the Shonholz principle in Devlin, the Second Circuit refused to expand its application, instead explaining that the mere fact that some employees considered the promised medical benefits in timing their retirements, without more, was insufficient to constitute "extraordinary circumstances" sufficient to warrant application of estoppel. Id.

Plaintiff urges this Court to find "extraordinary circumstances" based upon the acuteness of his disability and the fact that defendants provided conflicting information about which plan governed his disability benefits. (Pl.'s Mem. in Supp. of Mot. for Summ. J., at 16 (S.D.N.Y. Mar. 16, 2009).) However, the nature and extent of his disability are not relevant to a determination of whether defendants actions have given rise to "extraordinary circumstances," and reliance is already an element of an estoppel claim—thus, the fact that plaintiff received conflicting information and relied upon it is not, in and of itself, sufficient to constitute "extraordinary circumstances."

Moreover, Mr. Fershtadt's situation is wholly distinguishable from the "extraordinary circumstances" in Schonholz. There, defendants intentionally tricked plaintiff into retiring by promising certain "guaranteed" plan benefits, which vanished as soon as she retired. Although the concept of "extraordinary circumstances" has since

26

been expanded through the case law, inducement (even if not intentional) is still prerequisite to a finding of "extraordinary circumstances." See Arnold v. Storz, No. 00 Civ. 4485, 2005 WL 2436207, at *7 (E.D.N.Y. Sept. 30, 2005) (collecting cases). Mr. Fershtadt does not allege that he was induced (intentionally or otherwise) to exit the workforce based upon misrepresentations in disability benefits offered by Verizon. And he has been collecting benefits all along. Assuming PGI is right, and Mr. Fershtadt could not elect to participate in a new plan after he began collecting short-term disability benefits, the only harm he could have suffered was the loss of $492.32 as paid to join the new plan. These premiums have already been refunded to him (with interest). While unfortunate, if defendants made an error in plaintiff's case by soliciting him to change plans when he was ineligible to do so, plaintiff did nothing that qualifies as "reliance to his detriment"—either he was contractually entitled to make the change (in which case he will win the lawsuit) or he was not (in which case he suffered no harm). These circumstances are not "extraordinary" in the sense that is required before estoppel may be invoked, and plaintiff's motion for summary judgment is denied on this issue.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by MetLife (docket no. 51) is granted; the motions for summary judgment filed by Verizon and PGI (docket no. 57) are granted in part and denied in part; the motion for summary judgment filed by Mr. Fershtadt (docket no. 60) is denied; all motions to strike (docket nos. 84 & 90) are denied. Unum's motion for summary judgment (docket no. 64) will be decided following additional submissions. The Clerk of the Court is instructed to close the motions at docket no. 51, 57, 60, 84 & 90.

Unum is granted 10 days from the date of this order to submit evidence explaining what it does as an "outside administrative organization," to whom it answers and whether it provides insurance for the plans. Plaintiff will then have 10 days from the date of Unum's submission to show cause why summary judgment should not be granted in Unum's favor on the ground that Unum is not a proper party to this lawsuit. There will be no extensions allowed.

The parties are advised that we will proceed to litigate one narrow issue: the meaning of the language previously identified as ambiguous. That is the *only* issue for trial, and the parties are directed *not* to attempt to raise any other issues (including additional claims) as they are not properly before this Court.

PGI (the plan and sole remaining party) *must* come forward with competent evidence at trial supporting its assertion that the Bell Atlantic Plan pursuant to which Mr. Fershtadt received benefits was consolidated with the Verizon Plan for Group Insurance and was therefore governed by the terms of the 2004 SPD. This will most likely require PGI to identify the plan number corresponding Mr. Fershtadt's Bell Atlantic Plan, since the Plan for Group Insurance documentation explicitly identifies the plan numbers of certain Bell Atlantic plans that were consolidated under its umbrella.

This constitutes the decision and order of this Court.

Dated: February 09, 2010

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

28